

CJ-2022-2511
Timmons

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

MAY 3 1 2022

RICK WARREN
COURT CLERK

42

**DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

**BOBBY AND LINDA ROSS,**

     *Plaintiffs,*

v.

**STATE FARM FIRE AND CASUALTY**
**COMPANY and TODD BROWN,**

     *Defendants.*

**CJ-2022-2511**

Case Action No. _____

## PETITION

**EXHIBIT**

**1**

## TABLE OF CONTENTS

I.     INTRODUCTION...........................................................................................1

II.    PARTIES ......................................................................................................4

     A.    PLAINTIFFS BOBBY AND LINDA ROSS ...............................................4

     B.    DEFENDANT STATE FARM.................................................................4

     C.    DEFENDANT AGENT .........................................................................4

III.   VENUE.........................................................................................................5

IV.   LEGAL FRAMEWORK.............................................................................5

     A.    STATE FARM OWES ITS INSUREDS A DUTY OF GOOD FAITH AND FAIR DEALING ..............................................................................5

     B.    STATE FARM MUST MEET CERTAIN REQUIREMENTS TO DENY EARTHQUAKE COVERAGE CLAIMS IN OKLAHOMA IN GOOD FAITH ..................6

V.     FACTUAL ALLEGATIONS........................................................................8

     A.    STATE FARM ENTERED THE OKLAHOMA EARTHQUAKE INSURANCE MARKET IN SEARCH OF EASY PROFITS ...............................................9

     B.    STATE FARM'S PROFIT GAMBLE FAILED, SO STATE FARM DENIED COVERAGE WITHOUT REQUIRED PRE-COVERAGE INSPECTIONS .......................10

     C.    STATE FARM FALSELY JUSTIFIED ITS DENIALS OF VALID CLAIMS FOR EARTHQUAKE DAMAGE ...........................................................11

         1.    State Farm Relied on Adjuster Misrepresentations ...........................12

         2.    State Farm Relied on Sham Engineering Reports................................12

     D.    STATE FARM WRONGFULLY DENIED THE CLAIM IN FURTHERANCE OF ITS SCHEME TO DENY AND UNDERPAY EARTHQUAKE CLAIMS IN OKLAHOMA ....................................................................................15

         1.    Agent Bound Earthquake Coverage on the Dwelling Without an Inspection .........................................................15

         2.    An Earthquake Damaged Plaintiffs' Dwelling ....................18

         3.    State Farm Wrongfully Denied the Claim with a Sham Justification...............................................................18

VI.   FRAUDULENT CONCEALMENT.........................................................23

VII.   MISCELLANEOUS ..................................................................................27

VIII. CAUSES OF ACTION ..............................................................................28

     COUNT ONE...........................................................................................28

     COUNT TWO...........................................................................................29

     COUNT THREE .......................................................................................31

COUNT FOUR ........................................................................................................37

COUNT FIVE .........................................................................................................41

**IX.      PRAYER FOR RELIEF...........................................................................................43**

**X.       JURY DEMAND....................................................................................................44**

1.      Plaintiffs Bobby and Linda Ross, for this Petition against Defendants, State Farm Fire and Casualty Insurance Company ("State Farm"); and Todd Brown ("Agent" or the "Defendant Agent"), allege as follows:

## I.      INTRODUCTION

2.      This action concerns the ways in which State Farm defrauds its Oklahoma insureds through its systematic and pervasive denial of insureds' valid claims for earthquake damage to their homes.

3.      State Farm has profited from Oklahomans' growing concerns over increased earthquake frequency and severity for years by selling insurance policies that purport to cover earthquake damage.[1] State Farm reaped high profit margins because consumer concerns increased demand for coverage despite a relatively low incidence and risk of perilous earthquakes.

4.      However, earthquake frequency and intensity increased, and the Oklahoma Insurance Department ("OID") increased its regulation of the earthquake insurance market. Consequentially, State Farm's profit machine fell apart. To protect its bottom line, State Farm consciously implemented a fraudulent and profit-driven scheme to deny coverage for valid claims arising from its heavily marketed and oversold earthquake policies in Oklahoma.

5.      State Farm's scheme (as more fully described in Section V—"Factual Allegations") has the following three common elements, and each element furthers *all* instances of the scheme.

---

[1] State Farm is not the only well-known insurer to sell coverage for earthquake damage and then wrongfully deny its insureds' valid claims. Indeed, the Oklahoma Attorney General entered into a $25-million-dollar settlement with Farmers Insurance Company in 2021 after "[a]n investigation revealed that Farmers denied or failed to properly pay approximately one thousand earthquake claims submitted by Oklahomans." *See* OAG Press Release, available at https://www.oag.ok.gov/articles/attorney-general-hunter-insurance-commissioner-mulready-announce-25-million-settlement.

a) **Wrongful Denials of Valid Claims**: State Farm wrongfully denied (in whole or in part) its insureds' valid earthquake claims in violation of the duties it owes its insureds, Oklahoma law, and its own corporate guidelines.

b) **False Justification of Wrongful Denials**: State Farm provided its insureds with false justification for State Farm's wrongful denials through its adjusters, who fraudulently misrepresented facts material to the loss and claim. State Farm's adjusters reinforced their misrepresentations with sham engineering reports, which either (1) blame the claimed damage on a non-covered cause of loss or (2) disclaim that the damage resulted from a covered cause of loss. State Farm knowingly obtained these reports to further its scheme (*i.e.*, for the outcome-determinative purpose of denying a valid claim). State Farm chose to use sham engineering reports to support its adjusters' misrepresentations on specific claims based on various considerations, including the insured, circumstances of the claim, and the adjuster involved.

c) **Fraudulent Concealment**: State Farm actively and fraudulently concealed its institutional bad faith conduct from its insureds. Together, these three elements constitute State Farm's scheme—a pattern and practice of unlawful conduct, which State Farm foisted on numerous Oklahomans (including Plaintiffs).

6. Plaintiffs—State Farm's insureds and policyholders—unknowingly purchased what has been revealed as effectively illusory earthquake coverage from State Farm agent, Todd Brown ("Agent"). After an earthquake damaged Plaintiffs' Dwelling[2], Plaintiffs filed a valid claim (the "Claim") under a State Farm homeowners' insurance policy with an

---

[2] The residence, home, house, dwelling, and/or other structures owned by Plaintiffs are referred to throughout this Petition as the "Dwelling."

earthquake endorsement (the "Policy") for earthquake damage to the Dwelling. State Farm unlawfully denied (either in whole or in part) the Claim pursuant to and in furtherance of its scheme.[3]

7.      State Farm's treatment of Plaintiffs and adjustment of the Claim exemplifies and demonstrates its scheme: State Farm wrongfully denied the Claim by blaming the earthquake damage to the Dwelling on non-covered causes (*i.e.*, pre-existing damage, settlement, etc.). State Farm denied the Claim without the support of an inspection (as required by Bulletin No. PC 2015-02[4]) that (1) predated the cause of loss and (2) showed the damage in question. State Farm based its unlawful denial of the Claim on a sham report it procured from Censpace ("Engineer"). State Farm further justified its denial through its adjuster, who misrepresented material facts about the loss, Dwelling, and/or Claim to Plaintiffs to fraudulently induce their acceptance of State Farm's wrongful denial of the valid Claim. At all times, State Farm actively and fraudulently concealed these practices from Plaintiffs.

8.      State Farm (1) breached its contract with Plaintiffs, (2) breached its duty of good faith and fair dealing owed to Plaintiffs, and (3) defrauded Plaintiffs.[5] State Farm's conduct with respect to Plaintiffs represents a pattern and practice of unlawful claims handling throughout the State that has deprived Oklahoma insureds (including Plaintiffs) of millions of dollars in indemnity payments for effectively illusory earthquake coverage.

---

[3] *See* Section V.D., *infra.* for full details of Plaintiffs' Claim.

[4] The Oklahoma Insurance Commissioner issued Bulletin No. PC 2015-02 to all property and casualty insurers licensed in the State of Oklahoma (the "Bulletin"; *see* Section IV.B.—"Legal Framework").

[5] As explained in detail below, State Farm's Agent was, at all times, a knowing participant in the scheme.

## II.    PARTIES

### A.    Plaintiffs Bobby and Linda Ross

9.    Plaintiffs Bobby and Linda Ross.

10.    At all relevant times, Plaintiffs and State Farm were party to a valid contract for indemnity insurance for damage to the Dwelling caused by earthquakes, which was issued, administered, and adjusted by State Farm. Specifically, Plaintiffs purchased a replacement cost insurance policy with an earthquake endorsement from State Farm through State Farm's Defendant Agent.

### B.    Defendant State Farm

11.    Defendant State Farm Fire and Casualty Insurance Company ("State Farm") is a foreign insurer licensed to do business in the State of Oklahoma and has one or more agents located in Oklahoma County.

12.    State Farm sold and continues to sell earthquake coverage endorsements in conjunction with homeowners' policies in Oklahoma. At all times mentioned herein, by virtue of its relationship as insurer to Plaintiff-insureds, State Farm admittedly owed a special duty to Plaintiffs.

13.    Defendant State Farm is authorized and admitted to write insurance in Oklahoma and other states with its principal place of business in Bloomington, Illinois. Defendant State Farm may be served with process by and through the Oklahoma Insurance Commissioner, Five Corporate Plaza, 3625 NW 56th Street, Suite 100, Oklahoma City, Oklahoma 73112. *See* 36 O.S. § 36-621; 12 O.S. § 2004 (C)(1)(c)(3).

### C.    Defendant Agent

14.    Defendant Todd Brown owns and operates a State Farm agency.

4

15.     Throughout this Petition, Defendant Todd Brown is referred to as "Agent" or the "Agent Defendant."

16.     At all relevant times, Agent was a captive agent for State Farm.

## III.    VENUE

17.     Venue is proper in this Court pursuant to 12 O.S. § 137.

18.     Plaintiffs incorporate by reference all facts alleged in this Petition for purposes of establishing venue in Oklahoma County, Oklahoma, under 12 O.S. § 137.

## IV.    LEGAL FRAMEWORK

### A.     State Farm Owes Its Insureds a Duty of Good Faith and Fair Dealing

19.     This action turns (in part) on the ways in which State Farm ignored and violated the duties it owes to its insureds in Oklahoma.

20.     State Farm, as an insurer in Oklahoma, owes an implied-in-law duty to act in good faith and deal fairly with its insureds.

21.     While State Farm is free to make legitimate business decisions (and mistakes) regarding payment, State Farm is only free to do so as long as it acts reasonably and deals fairly and in good faith with its insureds.

22.     State Farm is liable under the tort of bad faith where it unreasonably and in bad faith withholds payment of its insured's claim.

23.     The decisive questions regarding whether State Farm has committed bad faith are whether State Farm's conduct was reasonable and whether State Farm had a good faith belief, at the time its performance was requested, that there was a justifiable reason to withhold payment under the policy.

**B.**    **State Farm Must Meet Certain Requirements to Deny Earthquake Coverage Claims in Oklahoma in Good Faith**

24.    This action focuses (in part) on the ways State Farm ignored and violated certain rules governing the handling of homeowners' insurance claims in Oklahoma.

25.    If an insurer's denial of a claim for earthquake damage is based on the insurer's position that the damage pre-existed the earthquake in question, then the denial must rest on an inspection of the property in question that pre-dates the claim and supports that position. Without the pre-loss inspection, the denial is improper. This requirement was set forth in the Notice Issued to Protect Oklahomans Who Have Earthquake Insurance, Oklahoma Insurance Commissioner, Earthquake Insurance Bulletin PC 2015-02 (March 3, 2015) (the "Bulletin").

26.    On March 3, 2015, John D. Doak, the Oklahoma Insurance Commissioner issued the Bulletin—Earthquake Insurance Bulletin No. PC 2015-02—to all property and casualty insurers licensed in the State of Oklahoma.[6]

27.    The Oklahoma Insurance Commissioner issues bulletins (like the Bulletin) pursuant to a statutory duty and authority to enforce and administer the insurance laws of the state and to adopt reasonable rules and regulations for the implementation and administration of the Oklahoma Insurance Code. *See* O.S. tit. 36, §§ 307, 307.1.

28.    The Bulletin amplified State Farm's then-existing underwriting and inspection requirements, which State Farm has kept hidden from its insureds and continues to hide from the public even today. The Bulletin provides (in relevant part) as follows:

> Earthquake policies exclude coverage of property damage which occurs, prior to the effective date of the policy and after termination of the policy. Insurers

---

[6] State Farm's earthquake insurance policies in Oklahoma insure against damage resulting from earth movement caused by: (a) "natural faulting of land masses" or (b) "convulsion of the earth's surface caused by natural seismic forces" or (c) "displacement within the earth's crust through release of strain associated with 'tectonic processes.'" Notice Issued to Protect Oklahomans Who Have Earthquake Insurance, Oklahoma Insurance Commissioner, Earthquake Insurance Bulletin PC 2015-02 (March 3, 2015).

understandably are only responsible for covered loss which occurs during the policy period. To help protect themselves from fraudulent claims, insurers have a right to inspect the property as often as required to ascertain the condition of the property.

In the case of frequent potential loss events, which may or may not result in a loss, it is important that the insurer know the condition of the insured property at inception of the coverage and remain cognizant of any damage that may have occurred during the policy period. In addition, since earthquake policies have a "single covered event clause" maintaining current knowledge of the insured property is essential to the proper application of deductibles.

As Commissioner, I have an obligation to enforce the insurance laws. Part of that responsibility is monitoring claims practices to determine whether insurers are employing fair claims practices and otherwise acting in conformity with the terms of their policies. **If an insurer intends to deny a claim, asserting pre-existing" [sic] damage, I expect that the insurer has inspected the property prior to inception of the coverage and maintained reasonably current information as to the condition of the insured property, prior to loss.**[7]

Because of the Bulletin, coverage denials based on pre-existing damage to properties that lack the support of a prior inspection are wrongful denials of coverage and, therefore, breach the insured's duty of good faith and fair dealing.

29.    The Bulletin is binding on all insurers doing business in Oklahoma, including State Farm. State Farm's failure to adhere to the Bulletin constitutes a breach of the duty of good faith and fair dealing (*i.e.*, "bad faith" claims handling).[8]

30.    At no time has State Farm or any other insurer challenged the findings or instructions contained in the Bulletin.

31.    The Bulletin is consistent with State Farm's own underwriting guidelines, policies, and procedures that require State Farm (and any party acting on State Farm's behalf)

---

[7] *Id.* (emphasis added).

[8] While the Bulletin does not raise a private cause of action—and this Petition does not bring claims arising from State Farm's violation of the Bulletin—State Farm's violation of the Bulletin is evidence of its bad faith and supports the allegations of breach of duty and fraud herein.

to perform an inspection of a property—inside and out—prior to or contemporaneously with the placement or renewal of earthquake insurance coverage on that property.

32.     The Bulletin's logic is manifest: if an insurer denies an earthquake claim on the grounds that the claimed damage pre-dates the attributable cause of loss (*i.e.*, resulted from, *e.g.*, settlement, not earthquake), the insurer should be able to point to an inspection report that shows the damage existed prior to the loss. This is consistent with the duty of good faith State Farm owes its insureds (including Plaintiffs): State Farm cannot sanitize its bad faith claims handling by utilizing hand-picked engineering firms, adjusters, and/or captive agents as a rubber-stamp and cover for an improper denial of a claim for pre-existing damage (*e.g.*, settlement).

33.     At all relevant times since March 3, 2015, State Farm has had actual knowledge of the Bulletin and the Bulletin's impact on its bottom line. Without a prior inspection, State Farm cannot satisfy the required "good faith belief" inherent to the duties owed to its insured in denying coverage based on pre-existing damage.

## V.     FACTUAL ALLEGATIONS

34.     All preceding paragraphs are incorporated as if fully set forth herein.

35.     While State Farm spends millions masquerading itself as Oklahoma's "Good Neighbor," its handling of Oklahoma earthquake claims shows a not-so-neighborly scheme to systematically deny and underpay valid claims for earthquake damage. The following subsections describe the scheme—its origins, motivations, and execution—in detail.

**A.      State Farm Entered the Oklahoma Earthquake Insurance Market in Search of Easy Profits**

36.      State Farm entered the Oklahoma earthquake insurance market decades ago. At the time, earthquakes were generally rare and minor in Oklahoma, so earthquake insurance presented a very manageable (and, therefore, profitable) risk for State Farm.

37.      Accordingly, while State Farm sold earthquake *coverage* in Oklahoma, State Farm never expected to be called upon to indemnify its insureds in Oklahoma for earthquake *damage*. While tremors were still relatively small and unremarkable, State Farm capitalized on public concern as a unique marketing and profit-making opportunity.

38.      Then, in approximately 2009, seismic activity in Oklahoma began to increase. While the Oklahoma Geological survey recorded forty-one "magnitude 3+" earthquakes in 2010, it recorded 579 in 2014, 903 in 2015, 623 in 2016, and 304 in 2017. This included the largest earthquake in the state's record seismic history—a record dating back to 1882—on September 3, 2016.

39.      This uptick, combined with consumers' heightened nervousness about earthquake damage to their homes, created the opportunity for State Farm's tremendous profit. To capitalize on that potential, State Farm aggressively marketed its earthquake insurance products in Oklahoma. It heavily incentivized its captive agents to sell its earthquake insurance products to its Oklahoma insureds. In fact, the market for selling earthquake insurance in the state became so imbalanced and profitable that the OID declared the market a "noncompetitive line of insurance" in 2016, meaning the profitability of insurers was "unreasonable." *See* Section IV—"Legal Framework," *supra*.

**B.**    **State Farm's Profit Gamble Failed, so State Farm Denied Coverage without Required Pre-Coverage Inspections**

40.    State Farm's profit gamble in the Oklahoma earthquake insurance market depended upon counter-balanced needs: to profit from its insureds' earthquake coverage *premiums*, State Farm needed to avoid paying earthquake *claims*.

41.    But the drastic increase in seismicity in Oklahoma beginning in approximately 2009 caused an increase in the number and size of claims from State Farm's insureds for earthquake damage. Numerous State Farm insureds in Oklahoma began making claims on their earthquake policies.

42.    So, State Farm immediately and summarily denied as many earthquake damage claims as possible as part of its company-driven scheme to protect its profit margin.

43.    Then, on March 3, 2015, Oklahoma Insurance Commissioner John D. Doak issued the Bulletin, Earthquake Insurance Bulletin No. PC 2015-02, to all property and casualty insurers licensed in the State of Oklahoma.[9] *See* Section IV, *supra*. The Bulletin amplified State Farm's then-existing inspection requirements under Oklahoma law, which State Farm has kept (and continues to keep) hidden from its insureds.

44.    Because of the Bulletin, State Farm's coverage denials—where the denial is based on its assertion that the claimed damage pre-existed the insured's claimed cause of loss—that were not supported by a prior inspection are wrongful. This result is consistent with State Farm's own underwriting guidelines, policies, and procedures, which require State

---

[9] State Farm's earthquake insurance policies issued in Oklahoma fall within the Bulletin's ambit because they insure against damage resulting from earth movement caused by: (a) "natural faulting of land masses" or (b) "convulsion of the earth's surface caused by natural seismic forces" or (c) "displacement within the earth's crust through release of strain associated with 'tectonic processes.'" Notice Issued to Protect Oklahomans Who Have Earthquake Insurance, Oklahoma Insurance Commissioner, Earthquake Insurance Bulletin PC 2015-02 (March 3, 2015).

Farm's agents to perform an inspection of a property—inside and out—prior to or contemporaneously with the placement or renewal of earthquake insurance coverage on that property.

45.     Therefore, State Farm's systematic and wrongful denials violated the Oklahoma Insurance Commissioner's binding directive that State Farm base denials for pre-existing damage on pre-coverage inspections.

46.     The Bulletin effectively destroyed what remained of State Farm's profit machine. State Farm could not deny claims without the Bulletin's required pre-inception and/or periodic renewal inspections. State Farm's gamble in the Oklahoma earthquake market became a failed bet.

**C.      State Farm Falsely Justified its Denials of Valid Claims for Earthquake Damage**

47.     State Farm was painfully aware of the requirements governing its denial of earthquake claims under Oklahoma law. It faced an untenable reality:

- State Farm's agents responded to corporate pressure to sell policies with systemic corner-cutting; they ignored the pre-inception and/or periodic renewal inspections State Farm's own guidelines require and wrote policies without any evidence that would support State Farm's denial of an earthquake claim for pre-existing damage;

- physical, in-person property inspections would significantly diminish State Farm's profit margin; and

- State Farm lacked the data to support a rate increase on earthquake policies from the OID.

48.     These limitations forced State Farm to devise a means to justify its bad faith conduct and keep it hidden from its insureds. Therefore, to continue denying valid earthquake damage claims, State Farm elected to justify (*i.e.*, cover) each unlawful and bad faith denial it issued as follows:

- by relying on its adjusters to justify denials through misrepresentations about the validity of the claim or the cause of damage; and

- by procuring (for certain insureds) sham engineering reports from its cadre of hand-picked engineering firms to further support its adjusters' misrepresentations and pre-determined denials.

State Farm's scheme serves a single nefarious end: the protection of State Farm's surplus through fraudulent claim denials at the expense of its insureds.

### 1.    State Farm Relied on Adjuster Misrepresentations

49.    For all valid earthquake claims State Farm wrongfully denied, State Farm issued each wrongful denial using its team of unqualified adjusters. These adjusters were conditioned to misrepresent to State Farm insureds that their earthquake damage pre-existed the earthquake in question, was caused by settlement, or was caused by some other non-earthquake peril.

50.    State Farm adjusters lacked the training or qualifications (and, in some instances, certification) to make such an assessment, which falls squarely within the purview of an independent, *unbiased* engineer.

51.    Moreover, State Farm lacked the required pre-inception and/or periodic renewal inspections to prove the damage pre-existed the insureds' claimed cause of loss. Nevertheless, State Farm's adjusters furthered the scheme by evaluating claims in bad faith, ignoring and/or disregarding relevant evidence from the insured, and/or ignoring or disregarding causative earthquake data. They then classified the damage the insured reported as "pre-existing damage," settlement, or another non-covered peril to justify State Farm's denial.

### 2.    State Farm Relied on Sham Engineering Reports

52.    For many of its insureds (including Plaintiffs), State Farm procured sham engineering reports from its chosen cadre of engineering firms to further bolster its unlawful

denial. At State Farm's request, direction, and control, these hand-picked engineering firms intentionally produced sham reports that State Farm's adjusters then used to further justify State Farm's unlawful, bad faith denials.

53.    State Farm engaged a discrete number of engineering firms operating in Oklahoma to further its scheme. At all relevant times, the engineering firms acted at State Farm's request, direction, and control on account of their mutually profitable and beneficial business relationship and in anticipation of obtaining future business from State Farm. Each of State Farm's selected engineering firms was biased in State Farm's favor; the business each firm received from State Farm constituted a significant portion of the firm's annual revenue and was contingent on the firm playing its proper role in the scheme. By issuing sham reports that allowed State Farm to implement its scheme, the engineering firms secured their continued revenue stream from State Farm. State Farm was—at all relevant times—wholly aware of this bargaining position with the engineering firms and used it to induce the firms' participation in the scheme.

54.    State Farm hired its preferred engineering firms to author engineering reports—drafted after the inception of the policy and the filing of the claim at issue—which misrepresent the insureds' cause of loss. State Farm then used those sham engineering reports as a justification for its denial of coverage.

55.    At all relevant times, State Farm's chosen engineering firms knowingly and intentionally:

- acted in furtherance of State Farm's scheme;

- omitted facts that supported coverage (*e.g.*, omitted data showing more proximate and potentially causative earthquakes); and/or

- mischaracterized earthquake damage as pre-existing damage, settlement, and/or some other false reason(s) supporting denial; and then

13

- provided these false conclusions to State Farm knowing that State Farm would use them to support an improper denial of a valid claim.

56.    To be certain, both the engineering firms and State Farm knew the conclusions contained in the engineering reports were false and would allow State Farm to avoid paying the indemnity it owed under earthquake policies. Specifically, State Farm and the engineering firms knew they did not possess any information regarding the condition of the property at issue prior to the date of loss. Without such evidence, neither State Farm nor the engineering firm could definitively and in good faith disprove the insured's claimed cause of loss.

57.    Despite this clear lack of knowledge, both the engineering firms and State Farm furthered the ruse that each sham engineering report was, instead, a *bona fide*, thorough, fair, and good faith assessment of an insured's claim.

58.    In each instance, the engineering firm drafted the sham report and provided it to State Farm with full knowledge that State Farm would provide the report (or at least its false conclusions) to the insured for the purpose of denying the valid claim.

59.    In each instance, State Farm provided the sham report to the insured and/or incorporated the false conclusions from the sham report into its documentation of its denial of the insured's claim.

60.    In each instance, State Farm intended the insured to rely on the sham report (and/or its false conclusions) by accepting its denial decision.

61.    At all times, State Farm's adjusters know they may call upon one of State Farm's select engineering firms to produce a sham report that would support denial of the claim and then use that report to pressure and induce the insured to accept the denial. Even when the adjuster declines to use a sham engineering report in denying the claim, the adjuster knows he or she has a sham report available to them as a weapon to induce the insured's compliance.

The conclusion of the report is pre-determined, so the adjuster knows it will support the denial even before they request it.

62.    On information and belief, State Farm evaluates the adjuster's performance (at least in part) on the adjuster's ability to close claims quickly, so the adjuster is incentivized to do so without resorting to a report unless necessary. The adjuster determines which claims require a sham report based on the insured, the circumstances of the claimed loss, and the adjuster involved.

63.    When the adjuster elects to use a sham report, doing so allows State Farm to falsely justify to its insured the wrongful denial of a valid earthquake claim. State Farm hid its conduct from its insureds under the guise of a supposedly objective and unbiased engineering report when, in reality, the reports were nothing more than a result-driven sham designed to insulate State Farm's profit margin.

**D.    State Farm Wrongfully Denied the Claim in Furtherance of Its Scheme to Deny and Underpay Earthquake Claims in Oklahoma**

**1.    Agent Bound Earthquake Coverage on the Dwelling Without an Inspection**

64.    At Plaintiffs' request, Agent bound coverage for earthquake damage on the Dwelling with State Farm. Agent agreed to do so and represented to Plaintiffs that Agent maintained the requisite skill, knowledge, training, and ability to obtain the requested coverage. Agent in fact procured an earthquake endorsement to the Policy from State Farm. Agent procured (and State Farm accordingly issued) the Policy with an earthquake endorsement on the Dwelling.

65.    Neither Agent nor State Farm performed any inspection of the Dwelling prior to the inception of earthquake coverage and/or periodically thereafter, as required by State Farm's own underwriting guidelines, policies, and procedures, as well as the Bulletin.

66.     Rather, and fully aware that no inspection (or re-inspection) of the Dwelling had occurred, State Farm, through its Agent, issued an earthquake coverage endorsement to Plaintiffs' Policy.

67.     By the affirmative act of writing Plaintiffs' Policy, State Farm represented to Plaintiffs the Dwelling met all State Farm's underwriting requirements, including the requirements imposed by the OID, and stated the Dwelling not only qualified for the earthquake coverage but that the coverage would in fact indemnify Plaintiffs in the event of a covered loss to the Dwelling. Plaintiffs relied on representations such as these, as evidenced at the very least by Plaintiffs' reasonable acceptance of State Farm's denial of the Claim as *bona fide*, genuine, and produced and delivered in good faith.

68.     Neither Agent nor State Farm advised Plaintiffs at any time that the Dwelling had any "pre-existing" damage.

69.     Agent, as State Farm's first line of underwriting, was to independently verify the Dwelling's condition to ensure the Dwelling met all underwriting requirements to qualify and obtain this additional earthquake coverage. State Farm's guidelines, policies, and procedures (as well as Oklahoma law) require Agent to conduct an inspection of the insured property (including the Dwelling) prior to inception of coverage, as well as periodically thereafter. Among other things, Agent was to independently verify the condition of the Dwelling, accurately take measurements of the Dwelling, and obtain information pertaining to various factors affecting the value of the Dwelling.

70.     Agent assured Plaintiffs this was true because the Dwelling had to first qualify for the coverage before an earthquake endorsement could be added to the policy. Therefore, the age, condition, and type of construction of the Dwelling would not only affect the eligibility

for an earthquake endorsement but also would dictate the calculation of the additional premium associated with the purchase of this endorsement. To determine the Dwelling's eligibility, an inspection would have been necessary and required. In the event the Dwelling was ineligible for the requested earthquake endorsement, Agent had an independent duty to report the same to Plaintiffs and to State Farm.

71.    Neither Agent nor State Farm advised Plaintiffs at any time that the Dwelling failed to meet State Farm's underwriting guidelines or that the Dwelling did not qualify for the additional earthquake coverage.

72.    Agent affirmatively represented to Plaintiffs that the Dwelling met State Farm's underwriting requirements and qualified for the additional coverage. State Farm further represented to Plaintiffs, directly and through Agent, that while adding an earthquake endorsement would increase Plaintiffs' premium, the additional cost was worth it because State Farm provided replacement cost earthquake coverage that purported to indemnify Plaintiffs fully in the event of earthquake damage to the Dwelling. State Farm further represented to Plaintiffs, directly and through Agent, that State Farm and Agent would act in accordance with Oklahoma law, fully and fairly investigate claims made, and pay all valid claims. Plaintiffs relied on said representations. Agent and State Farm confirmed these representations by issuing the earthquake endorsement to the Policy.

73.    Agent was fully aware of State Farm's scheme at all relevant times. Agent possessed (1) extensive experience within State Farm's agent structure and cadre, (2) general knowledge of State Farm's history of denying nearly all earthquake claims in Oklahoma, and (3) knowledge of the claims made by Agent's customers, which State Farm denied as part of the scheme. Agent knew State Farm had no intention of paying valid claims for earthquake

damage. Agent thereby knew the earthquake coverage it sold as part of the Policy was effectively illusory. Nevertheless, and despite this knowledge, Agent affirmatively decided to sell Plaintiffs the earthquake endorsement to the Policy to Plaintiffs' detriment. Agent was, at all times, a knowing and active participant who furthered State Farm's scheme.

74.     State Farm incentivized Agent's sale of illusory coverage, at least in part, by tying Agent's compensation to Agent's loss ratio, which turns on both premiums sold and claims paid. More premiums sold—and fewer claims paid on the policies those premiums represent—means higher compensation for Agent.

### 2.     An Earthquake Damaged Plaintiffs' Dwelling

75.     One or more earthquakes directly damaged Plaintiffs' Dwelling on or about May 31, 2020.[10]

76.     Subsequently, Plaintiffs properly and timely submitted the Claim to State Farm for the earthquake damage to the Dwelling.

77.     State Farm received timely notice of the Claim. Plaintiffs cooperated with all requests during State Farm's loss investigation. Plaintiffs complied with all conditions precedent under the Policy.

78.     The earthquake that damaged the Dwelling was a covered loss under the Policy, which entitled Plaintiffs to all benefits under the Policy.

### 3.     State Farm Wrongfully Denied the Claim with a Sham Justification

79.     In response to the Claim, State Farm confirmed the Dwelling was damaged.

80.     State Farm determined, even before its adjuster stepped foot on/in the Dwelling, that it would deny the Claim. To conceal its scheme and justify its denial of the Claim, State

---

[10] Under the Policy, State Farm considers one or more earthquakes occurring within a seventy-two-hour period to be a single occurrence.

Farm directed its adjuster to attribute the damage to preexisting damage, construction defects, drying/curing materials, and settlement.

81.    Rather than paying the Claim, State Farm conducted a sham, pre-textual investigation by and through its adjuster. State Farm's adjuster produced a sham report and/or letter to Plaintiffs regarding the Dwelling at State Farm's request, direction, and control to justify the "investigation," which was nothing more than a scripted cover to justify denial.

82.    State Farm's claims adjuster reached this conclusion by intentionally ignoring (at State Farm's request, direction, and control) the following:

       a)    the manner in which the Dwelling was built;

       b)    Plaintiffs' history and account;

       c)    the occurrence of other seismic events within a significant geographic proximity to the Dwelling and temporal proximity to the Dwelling and the Claim;

       d)    Oklahoma law;

       e)    State Farm's own underwriting guidelines, procedures, and policies; and

       f)    State Farm's failure to conduct a pre-inception and/or periodic renewal inspection as required by the OID.

83.    Moreover, State Farm dispatched its adjuster to the Dwelling for one predetermined purpose: deny the Claim and conceal the falsity and pre-textual basis of the denial with a sham justification.

84.    Furthermore, the adjuster based his false conclusions upon and incorporated into State Farm's denial a sham engineering report from Engineer (the "Report"). The Report was pre-textual; at State Farm's request, direction, and control, Engineer drafted the report to support State Farm's pre-determined denial of the Claim by falsely citing non-covered causes of loss.

85.     In reaching its conclusion, Engineer, at State Farm's request, direction, and control, (among other failures) intentionally ignored:

   a)     the manner in which the home was built;

   b)     Plaintiffs' history and account;

   c)     the occurrence of other seismic events within a significant geographic proximity to the Dwelling and temporal proximity to Plaintiffs' loss;

   d)     Oklahoma law;

   e)     State Farm's own underwriting guidelines, procedures, and policies; and

   f)     State Farm's failure to conduct a pre-inception and/or periodic renewal inspection as required by the OID.

86.     Moreover, at all relevant times, Engineer, the adjuster, and State Farm (by means of its Claims Specialists, Team Leaders, Claim Consultants, and executive management), knew the Report was designed for one purpose: as a rubber-stamp and cover for State Farm's unlawful and bad faith denial of the Claim. Nevertheless, they incorporated the Report's conclusions into the Claim denial and transmitted it to Plaintiffs with full knowledge Plaintiffs would rely upon them.

87.     Shortly thereafter, State Farm wrongfully denied the Claim.

88.     At all relevant times, the Report formed part of State Farm's claim file on the Claim.

89.     State Farm provided the Report to Plaintiffs directly and/or by incorporating the substance and conclusions of the Report into written and/or verbal communications forming the denial of the Claim.

90.     Plaintiffs relied on the adjuster's and State Farm's denial, as well as the statements and conclusions therein, as *bona fide*, good faith, honest, and fair adjudications of the Claim. Plaintiffs' reliance was detrimental, as discussed more fully in the following section.

91.     Inasmuch as earthquake damages bear directly on the structural soundness and
safety of the Dwelling, State Farm thereby unlawfully jeopardized Plaintiffs' safety and well-
being, in addition to Plaintiffs' peace of mind and security.

92.     State Farm breached the insurance contract with Plaintiffs and/or breached the
duties it owed to Plaintiffs by (at least and among other actions and/or omissions):

a)      Failing to disclose the lack of a pre-coverage inspection underlying its
denial of the Claim;

b)      Directing its adjuster, who sat in a position of ostensible power,
experience, and knowledge as compared to Plaintiffs:

    i)      to classify damage to the Dwelling as pre-existing the claimed
cause of loss;

    ii)     to justify its denial of the Claim;

    iii)    to support the denial of coverage based on pre-existing damage
in the absence of a legally required pre-coverage inspection; and

    iv)     to ignore opinions from other knowledgeable tradesmen or
engineers that are contrary to the adjuster's findings;

c)      Using the sham Engineer Report, which Engineer prepared at State
Farm's request, direction, and control:

    i)      to justify its denial of the Claim;

    ii)     to support the denial of coverage based on pre-existing damage
in the absence of a legally required pre-coverage inspection; and

    iii)    while failing to consider opinions from other knowledgeable
tradesmen or engineers that are contrary to engineering report
opinions;

d)      Failing to disclose that:

    i)      State Farm, its adjuster, and Engineer ignored State Farm
guidelines, policies, and procedures;

    ii)     State Farm's agent had a duty to perform an inspection of the
Dwelling prior to the placement of earthquake insurance;

iii)    State Farm dictated the scope of the investigation to/for the adjuster;

iv)    State Farm did not provide Engineer a copy of the relevant underwriting file;

v)    State Farm dictated the scope and outcome of the investigation to/for Engineer; and

vi)    neither State Farm, nor its adjuster, nor Engineer obtained all relevant evidence from Plaintiffs regarding the condition of the Dwelling before the earthquake Claim or that any evidence State Farm and/or the adjuster had from Plaintiffs regarding the condition of the Dwelling before the earthquake Claim was not considered or accepted;

e)    Failing to disclose that State Farm's adjuster, at State Farm's request, direction, and control,

i)    misstated the Dwelling history in its report;

ii)    omitted and/or failed to acknowledge in its report that State Farm failed to provide a pre-coverage history (*e.g.*, prior inspections and/or photos) in advance of inspection;

iii)    skewed, misstated, and/or omitted facts in its report to ensure the report downplayed Dwelling damage to arbitrarily rule out coverage;

iv)    disregarded the occurrence and proximity of earthquakes that occurred near the Dwelling; and

v)    chose to base its reports on seismic events that happened farther away from the Dwelling than other more likely causative events so as to downgrade damage and support claim denial;

f)    Failing to disclose that Engineer, at State Farm's request, direction, and control:

i)    misstated Plaintiffs' property history in the Report;

ii)    omitted and/or failed to acknowledge in the Report that State Farm failed to provide a pre-coverage history (*e.g.*, prior inspections and/or photos) in advance of inspection;

iii)    skewed, misstated, and/or omitted facts in Report to ensure the Report arbitrarily ruled out coverage;

        iv)      skewed, misstated, and/or omitted facts in Report to ensure the report downplayed the extent of the property damage in an effort to convince the insured that the Claim did not exceed the applicable deductible;

        v)      disregarded the occurrence and proximity of earthquakes that occurred near the Dwelling; and

        vi)     chose to base its reports on seismic events that happened farther away from the Dwelling than other more likely causative events so as to downgrade damage and support claim denial;

g)      Advising Plaintiffs that earthquakes in Oklahoma were simply not strong enough to cause damage to the Dwelling while knowing such statements were false;

h)      Coercing and intimidating Plaintiffs to accept its finding and denial of the Claim;

i)      Performing a biased investigation of the Claim;

j)      Wrongfully denying the Claim;

k)      Failing to disclose the legal obligation to base denials on a pre-coverage inspection; and

l)      Failing to pay all benefits owed under the contract.

## VI.    FRAUDULENT CONCEALMENT

93.     All preceding paragraphs are incorporated as if fully set forth herein.

94.     Inherent to State Farm's scheme are State Farm's extensive efforts to keep it a secret. To be certain, at all relevant times, State Farm took active and affirmative steps to conceal its fraudulent scheme from Plaintiffs and its other Oklahoma insureds (as well as the Oklahoma Insurance Commissioner and Insurance Department).

95.     At all relevant times, State Farm had a duty to disclose to Plaintiffs that it lacked the pre-inception and/or periodic renewal inspection required by the Bulletin issued by the OID (and State Farm's own policies and procedures) to deny the Claim on the basis of pre-existing damage or other excluded causes.

96.    State Farm's duty to disclose relevant and material information to Plaintiffs related to the Claim and/or State Farm's scheme is inherent in the duty of good faith State Farm owed to Plaintiffs. As a result of State Farm's active and fraudulent concealment of its pattern of bad faith conduct from Plaintiffs, which continues today, Plaintiffs were placed on a decidedly unlevel playing field, which is anathema in the context of a heightened duty.

97.    Despite this duty, and consistent with State Farm's pervasive, company-wide fraudulent scheme, State Farm actively, intentionally, and fraudulently concealed its conduct from Plaintiffs. This concealment is an inherent and important aspect of State Farm's scheme; like any seasoned fraudster, State Farm knew its scheme would work only if it was kept secret. Any sunlight on State Farm's bad acts would result in the reckoning this suit is intended to provide.

98.    State Farm's pattern of bad faith conduct—and, specifically, State Farm's intentional concealment of the scheme to further its end and ensure its success—is an artifice, which State Farm intended to prevent Plaintiffs from having knowledge of the facts surrounding the scheme.

99.    State Farm's conduct includes a litany of affirmative acts of concealment, as well as numerous material misrepresentations, which individually and collectively eluded suspicion and prevented inquiry on Plaintiffs' part. State Farm's fraudulent concealment continues today.

100.    State Farm concealed its obligations through positive acts of fraud, including (but not limited to):

a)    Transmitting to Plaintiffs (either orally or directly via mail) the sham causes of loss and/or pretextual denial of the Claim;

24

b)     Transmitting to Plaintiffs (either orally or directly via mail) the sham Report (and/or its conclusions);

c)     Incorporating sham conclusions into letter(s) denying the Claim;

d)     Representing to Plaintiffs that Engineer conducted a full, fair and un-biased investigation in good faith; and

e)     Representing to Plaintiffs that its investigation into the Claim was a full and fair investigation and was made in good faith.

101.     State Farm concealed its fraudulent bad faith conduct through knowing and intentional omissions, which constitutes fraud in light of the duty of good faith State Farm owes to its first-party insureds, including Plaintiffs. In furtherance of its scheme, and among others, State Farm concealed the following from Plaintiffs:

a)     State Farm's systematic, pervasive scheme to deny earthquake claims to wrongfully minimize its risk in the Oklahoma earthquake insurance market;

b)     State Farm's failure to inspect the Dwelling before issuing coverage and/or maintaining current information as to the condition of the Dwelling prior to the loss;

c)     State Farm's failure to follow its own earthquake claims handling guidelines, policies, and procedures in the adjustment of the Claim;

d)     State Farm's failure to follow the OID Bulletin in denying the Claim without a prior inspection;

e)     State Farm's failure to ensure its agents followed State Farm's own guidelines, policies, and procedures regarding the need to inspect a dwelling prior to placing earthquake coverage;

f)     State Farm's use of engineers to further the scheme, including but not limited to State Farm's denial of the Claim on the basis of the sham Report, which Engineer prepared at State Farm's request, direction, and control for the pre-determined purpose of denying the Claim;

g)     Engineer produced the sham Report for State Farm at State Farm's request, direction, and control;

h)     State Farm's ongoing relationship with Engineer and certain other engineering firms in furtherance of the scheme;

i) State Farm's denial rate for Oklahoma earthquake claims based on engineering reports;

j) Whether State Farm was monitoring earthquake denial rates;

k) Whether or not State Farm was monitoring which of its various engineering firms most regularly supported claims denials; and

l) State Farm's use of its adjusters to issue unlawful and bad faith denials.

102. State Farm's misrepresentations induced Plaintiffs to inaction. In light of the heightened duty State Farm owed Plaintiffs and the latent nature of its pattern of fraudulent bad faith conduct, Plaintiffs relied on State Farm's misrepresentations, which ultimately induced Plaintiffs to:

a) Accept State Farm's denial, as well as its adjuster's statements and conclusions (as well as those of Engineer and the Report), as a *bona fide*, genuine, and good faith representation and determination of coverage and benefits under the Policy; and/or

b) Decline:

    i) further action to pursue indemnity;

    ii) further inquiry into the validity and veracity of State Farm's denial, its adjuster's statements, or its adjuster's conclusions; and

    iii) pursuit of legal remedies available to Plaintiffs (until Plaintiffs discovered the existence of this cause of action).

103. State Farm knew Plaintiffs' knowledge of State Farm's misrepresented, concealed, and/or hidden information would have been important to Plaintiffs, which is why State Farm actively and fraudulently concealed it from Plaintiffs. State Farm's scheme would have failed if Plaintiffs and the public learned of such information because Plaintiffs would have (at least and among other actions):

a) sought and demanded full indemnification under the Policy;

b) performed an independent investigation into State Farm's denial;

26

c)      sought legal counsel; and/or

d)      filed suit.

104.    State Farm's fraudulent concealment tolls the running of any applicable statute of limitations and/or applicable Policy suit provisions (if any).

105.    Plaintiffs did not know the facts constituting any potential causes of action against State Farm until very recently. Given State Farm's active and fraudulent concealment of its scheme, Plaintiffs could not have reasonably discovered Plaintiffs' potential causes of action any earlier. Further, Plaintiffs exercised reasonable diligence to ascertain said facts. That diligence ultimately resulted in Plaintiffs retaining counsel to file this lawsuit.

## VII.    MISCELLANEOUS

106.    All preceding paragraphs are incorporated as if fully set forth herein.

107.    Any condition precedent to the institution of this lawsuit has been performed, has occurred, or has been waived.

108.    The filing of this lawsuit does not constitute a waiver or release of any right, claim, action, cause of action, or defense, nor does it constitute any election of remedies presently available or available in the future. Rather, all such rights, claims, actions, causes of action, and/or defenses are hereby reserved.

109.    However, any claim or cause of action that may exist concerning the rates State Farm charged to any insured for any insurance policy State Farm may have written and/or sold is hereby disclaimed.

## VIII.  CAUSES OF ACTION

**COUNT ONE**
**Breach of Contract**
*Against Defendant State Farm*

110.    All preceding paragraphs are incorporated as if fully set forth herein.

111.    Plaintiffs entered into a contract for insurance coverage with State Farm to provide coverage for the Dwelling. The Policy was in full force and effect at all material times hereto.

112.    Plaintiffs provided proper and timely notice to State Farm of the Claim arising from earthquake damage to the Dwelling.

113.    In all material ways, Plaintiffs complied with the terms and conditions of the Policy.

114.    State Farm breached its contractual obligations under the terms and conditions of the insurance contracts with Plaintiffs by failing to pay all benefits owed to Plaintiffs under the Policy.

115.    State Farm breached its contract with Plaintiffs by (among other things) failing to indemnify Plaintiffs for losses caused to the Dwelling by the earthquake, which was a covered peril under Plaintiffs' Policy.

116.    State Farm additionally actively, intentionally, and fraudulently concealed its scheme to deny valid earthquake claims (including that of Plaintiffs). This concealment is an inherent and important aspect of State Farm's scheme; as State Farm knew its scheme would work only if it was kept secret.

117.    As a result of State Farm's material breach of contract and other wrongful conduct, Plaintiffs have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interests.

## COUNT TWO
### Breach of the Duty of Good Faith and Fair Dealing
### ("Bad Faith")
*Against Defendant State Farm*

118.    All preceding paragraphs are incorporated as if fully set forth herein.

119.    State Farm owed a duty to Plaintiffs to deal fairly and in good faith.

120.    State Farm's obligations arise from agreement memorialized in the Policy.

121.    State Farm's obligations are codified and detailed in the Oklahoma Insurance Code.

122.    State Farm's failure to implement and/or follow Oklahoma's statutory Insurance Code is further evidence of its "bad faith"—a breach of its duty to deal fairly and in good faith.

123.    State Farm's obligations arise from their own underwriting guidelines, policies procedures, and protocols.

124.    State Farm's failure to implement and/or follow its own underwriting guidelines, policies, procedures, and protocols further evidences its "bad faith."

125.    State Farm breached its duty to Plaintiffs to deal fairly and in good faith by conduct (both acts and omissions) related to its scheme to deny and underpay earthquake claims, including all conduct, acts, and omissions set forth in this Petition, and including but not limited to the following:

    a)    Denying (in whole or in part) coverage to Plaintiffs under the Policy on the basis of pre-existing damage without the support of a prior inspection;

    b)    Knowingly and intentionally failing (with regard to Plaintiffs) to:

        i)    disclose State Farm's lack of compliance with the Bulletin in denying the Claim on the basis of pre-existing damage without the support of a prior inspection;

ii)     disclose all coverages and benefits applicable to the Claim through a purposeful, wrongful, and repeated lack of good faith communication;

iii)     pay the full and fair amount for damage sustained to the Dwelling by earthquakes in accordance with the terms and conditions of the Policy;

iv)     pay all additional coverages due and owing under the terms and conditions of the Policy, thereby unfairly and without valid basis, reducing the fair amount of the Claim;

v)     pay all pertinent benefits, coverages, and other provisions under the terms and conditions of the Policy in purposeful, wrongful, and repeated violation of Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16;

vi)     perform a full, fair, and objective investigation of damages to the Dwelling;

vii)     perform a full, fair, and objective investigation of damages to the Claim;

viii)     inspect the Dwelling prior to inception of the earthquake coverage;

ix)     maintain current information, including routine inspections as required by State Farm's own policies, procedures, and/or guidelines, as to the condition of the Dwelling prior to the loss;

x)     inform of all rights to indemnity payments; and

xi)     engage in objective claims handling practices with regard to the Claim;

c)     Knowingly and intentionally engaging in:

i)     outcome-oriented investigations and claims handling practices;

ii)     outcome-oriented investigations through the use of a biased Engineer;

iii)     a pattern and practice of denying indemnity payments owed to its insureds, including Plaintiffs, under valid earthquake insurance policies, including denial of the Claim;

iv)     an arbitrary and capricious method of adjusting the Claim;

v)      an arbitrary and capricious method of refusing to issue indemnity payments owed;

vi)     conduct that forced Plaintiffs to retain counsel to recover insurance benefits to which Plaintiffs were entitled under the terms and conditions of the Policy; and

vii)    a fraudulent scheme that included the concealment through both positive acts and omissions, the fraudulent basis for the denial of coverage under Plaintiffs' valid earthquake insurance Policy, and other critical aspects of the scheme.

126.    State Farm's conduct, as described above, constitutes bad faith and is a material breach of the terms and conditions of the insurance contracts between the parties.

127.    State Farm's actions were intentional, willful, and malicious; in reckless disregard of Plaintiffs' rights; and are sufficiently egregious in nature so as to warrant the imposition of punitive damages.

128.    As a consequence of State Farm's breach of the duty of good faith and fair dealing, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering that naturally results from an insurance failure, and has been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

## COUNT THREE
### Fraud
*Against Defendant State Farm*

129.    All preceding paragraphs are incorporated as if fully set forth herein.

130.    State Farm owed Plaintiffs a duty of good faith and fair dealing.

131.    State Farm knew:

a)      State Farm owed Plaintiffs a heightened duty;

b)      Plaintiffs:

     i)      conscientiously paid insurance premiums;

     ii)     believed (and had every reasonable basis to believe) State Farm would fairly and honestly pay a covered claim incurred during the life of the Policy;

     iii)    suffered losses due to a covered peril;

     iv)    fully performed all Plaintiffs' obligations under the Policy; and

     v)     deserved all benefits permitted under the Policy; but nevertheless,

   c)    State Farm intended to perpetrate the full extent and nature of its scheme against Plaintiffs and other Oklahoma insureds.

132.    Throughout State Farm's adjustment of the Claim, State Farm intended to deny the Claim pursuant to the scheme and the motive behind it, as described above.

133.    Throughout State Farm's adjustment of the Claim, State Farm knew the denial of the Claim was unlawful and in bad faith because (among other things):

   a)    State Farm intended to deny and ultimately denied the Claim on the basis of pre-existing damage without the support of a legally required prior inspection;

   b)    State Farm intended to deny and ultimately denied the Claim by means of a false denial from State Farm's adjuster;

   c)    State Farm intended to justify and cover its wrongful denial of Plaintiffs' Claim by means of a sham, pretextual engineering report; and

   d)    State Farm concealed the operation of its scheme on Plaintiffs and the Claim through both positive acts and omissions.

134.    State Farm made numerous express and implied representations and gave assurances to Plaintiffs, including (but not limited to) the following:

   a)    State Farm conducted its analysis and assessment of the Claim in good faith;

   b)    State Farm based its decision to deny the Claim on a valid prior inspection from the time of inception of coverage as required by its underwriting guidelines, policies, and procedures;

c)    State Farm based its decision to deny the Claim on a valid prior inspection from the time of inception of coverage as required by Oklahoma law;

d)    State Farm considered Plaintiffs' proffered evidence regarding the condition of the Dwelling before the earthquake Claim;

e)    State Farm reviewed and considered Plaintiffs' underwriting file in adjusting the Claim and issuing its denial;

f)    State Farm considered the occurrence and proximity of all earthquakes that occurred near the Dwelling;

g)    State Farm gave Plaintiffs the benefit of the doubt in the absence of any pre-inspection report that conclusively showed the existence of pre-existing damage to the Dwelling; and

h)    State Farm based its decision to deny the Claim on a *bona fide*, truthful, objective, fair, and unbiased investigation.

135.    All express and implied representations were material.

136.    All express and implied representations were false.

137.    Despite State Farm's aforementioned knowledge, and in spite of State Farm's aforementioned misrepresentations, State Farm nevertheless:

a)    withheld indemnity payment owed to Plaintiffs;

b)    took no steps to inform or disclose to Plaintiffs all entitlement to indemnity;

c)    took no steps to inform or disclose to Plaintiffs that State Farm's denial of the Claim was unlawful;

d)    subjected Plaintiffs to its fraudulent scheme in direct contravention of the duty it owed to Plaintiffs; and

e)    elected silence over its duty to inform Plaintiffs of all applicable benefits and the unlawful basis of the denial of the Claim.

138.    State Farm knowingly, purposefully, and fraudulently concealed and hid material facts and information from Plaintiffs. State Farm failed to disclose material facts and

information to Plaintiffs related to the Policy, coverage, and Claim, including but not limited

to the following material facts and information:

    a)    State Farm's systematic, pervasive scheme to deny earthquake claims to extricate itself from the Oklahoma earthquake insurance market;

    b)    State Farm's failure to:

        i)    inspect the Dwelling before issuing coverage and/or maintaining current information as to the condition of the Dwelling prior to the loss;

        ii)    follow its own underwriting guidelines, policies, and procedures in denying the Claim without a prior inspection;

        iii)    follow its own claims handling guidelines, policies, and procedures in the adjustment of the Claim;

        iv)    follow the Bulletin in denying the Claim without a prior inspection;

        v)    ensure its agents followed State Farm's own guidelines, policies, and procedures regarding the need to inspect a dwelling prior to placing earthquake coverage; and

        vi)    ensure its adjusters followed State Farm's own claims handling guidelines, policies, and procedures regarding inspection of earthquake damage;

    c)    Plaintiffs' entitlement to complete indemnity in connection with loss or damage to the Dwelling;

    d)    State Farm subjected Plaintiffs to its scheme, which included:

        i)    a coordinated policy and practice of not indemnifying first-party insureds for earthquake claims in Oklahoma when owed;

        ii)    a policy and practice of not disclosing to first-party insured claimants the circumstances in indemnity was payable pursuant to earthquake insurance coverage;

        iii)    established procedures and policies regarding earthquake coverage claims' denials that were not disclosed on Defendants' written policy, marketing, and other materials provided and/or available to Plaintiffs;

iv)    "pre-existing damage" to justify denial of coverage on the Dwelling without basing that decision on a legally required prior inspection;

v)    the use of sham engineering reports to justify and cover the scheme; and

vi)    false statements to advise Plaintiffs that earthquakes in Oklahoma were simply not strong enough to cause damage to the Dwelling while knowing such statements were false;

e)    State Farm's use of its adjusters to issue unlawful and bad faith denials;

f)    State Farm's use of Engineer, at State Farm's request, direction, and control, which included:

i)    misstating Plaintiffs' property history in the Report;

ii)    omitting and/or failed to acknowledge in the Report that State Farm failed to provide a pre-coverage history (*e.g.*, prior inspections and/or photos) in advance of inspection;

iii)    skewing, misstating, and/or omitting facts in Report to ensure the Report arbitrarily ruled out coverage;

iv)    skewing, misstating, and/or omitting facts in Report to ensure the report downplayed the extent of the property damage in an effort to convince the insured that the claim did not exceed the applicable deductible;

v)    disregarding the occurrence and proximity of earthquakes that occurred near the Dwelling; and

vi)    choosing to base its reports on seismic events that happened farther away from an insured's property than other more likely causative events so as to downgrade damage and support claim.

139.    Because State Farm knew its denial of the Claim was unlawful, State Farm's failure to speak constituted concealment and fraud.

140.    State Farm's fraudulent behavior is such that intent, although present, is not required because State Farm's acts and omissions also constitute constructive fraud.

141.    Plaintiffs relied on State Farm's misrepresentations, which subjected Plaintiffs to direct financial detriment and harm. As a result of State Farm's fraud and concealment of

that fraud, State Farm gained an unfair and unlawful advantage over Plaintiffs. Specifically, State Farm misled Plaintiffs to believe at least the following falsities:

    a)    State Farm's coverage determination and subsequent denial were *bona fide*, genuine, fair, and made in good faith; and

    b)    Plaintiffs lacked any entitlement to indemnity under the Policy as stated in the fraudulent denial;

142.    In light of the heightened duty State Farm owed Plaintiffs and the latent nature of State Farm's fraudulent scheme, Plaintiffs relied on State Farm's misrepresentations, which ultimately induced Plaintiffs to:

    a)    accept the denial as a *bona fide*, genuine, fair and good faith representation and determination of coverage and benefit under the Policy;

    b)    take no further action to pursue indemnity;

    c)    decline inquiry into the validity and veracity of State Farm's denial;

    d)    decline inquiry into the validity and veracity of the adjuster's statements; and

    e)    decline to pursue legal remedies available (until discovering the existence of these cause of action).

143.    State Farm knew Plaintiffs' receipt of such misrepresented and/or concealed and hidden information would have been important to Plaintiffs in that it would have caused Plaintiffs to (among other acts) seek and demand full indemnification under the Policy, conduct an independent inquiry into the denial, its validity, and its veracity, or pursue legal action to secure all benefits owed under the policy.

144.    Ultimately, State Farm defrauded Plaintiffs through its scheme to systematically deny earthquake coverage claims by unlawfully and intentionally denying the Claim.

145.     As a consequence of State Farm's fraudulent conduct, Plaintiffs have sustained damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

146.     State Farm's actions were intentionally designed to result in additional financial profits for State Farm and to deprive Plaintiffs of indemnity owed under the Policy. State Farm's conduct was intentional, willful, malicious, and in reckless disregard of the rights of Plaintiffs; and/or was grossly negligent; and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

147.     State Farm's misrepresentations constitute fraud, and its active concealment of their fraudulent practices tolls the running of any applicable statute of limitations.

### COUNT FOUR
### Negligence in the Procurement of Insurance
*Against Defendant Agent*

148.     All preceding paragraphs are incorporated as if fully set forth herein.

149.     Defendant Todd Brown is a captured agent of State Farm, and as such, serves as the first line of underwriting for State Farm. At all material times hereto, Agent acted as State Farm's agent, employee, or ostensible agent. State Farm is vicariously liable for the conduct of Agent.

150.     Agent owed Plaintiffs a series of duties. These duties include (but are not limited to) the duty to:

    a)     act in good faith;

    b)     exercise reasonable care, skill and diligence in the procurement and maintenance of insurance for Plaintiffs;

    c)     accurately and fully inform Plaintiffs of all coverages and benefits under the Policy;

d)      calculate the replacement cost value set forth in the Policy and additional premium associated with the purchase of said earthquake endorsement;

e)      advise Plaintiffs of the benefits, risks, limitations, and exclusions in the coverage procured under the Policy;

f)      gather and maintain specific information regarding the Dwelling to be insured so as to inform coverage; and

g)      perform a reasonable inspection of the Dwelling prior to the inception of coverage under the Policy and periodically thereafter.

151.    Prior to the Claim, Plaintiffs contacted and engaged Agent to procure replacement cost coverage with an earthquake endorsement for the Dwelling. Plaintiffs informed Agent of the Dwelling to be insured and provided all details that Agent requested about the Dwelling to Agent. Plaintiffs asked Agent if Agent could procure (a) a full replacement cost policy, and (b) earthquake coverage, for the Dwelling.

152.    Agent represented to Plaintiffs:

a)      the Dwelling had to meet State Farm's underwriting guidelines and qualify for replacement cost coverage and the additional earthquake coverage;

b)      an inspection of the Dwelling was needed to determine the Dwelling's condition;

c)      the Dwelling was in good condition, met all of State Farm's underwriting requirements, and qualified for the additional earthquake coverage;

d)      there were no preexisting issues with the Dwelling that would limit or restrict the coverage in the event of either a partial or total loss;

e)      there were no preexisting issues with the Dwelling that would conflict with State Farm's underwriting guidelines, policies, or procedures;

f)      the Policy (together with the earthquake endorsement):

i)      provided the coverage Plaintiffs requested;

ii)     provided full replacement cost;

       iii)     provided a replacement cost calculation that represented 100% insurance-to-value;

       iv)     provided coverage for damage caused by earthquakes; and

       v)     would fully pay to repair or replace any of the Dwelling back to its pre-loss condition in the event of covered damages or loss;

g)     Agent had the requisite insurance agent skills and expertise to properly procure the insurance coverage Plaintiffs requested;

h)     Agent had the requisite expertise and skill to independently calculate the replacement cost coverages (including that of the earthquake endorsement) utilizing State Farm's valuation software;

i)     Agent was familiar with the type of insurance Plaintiffs requested;

j)     Agent could obtain the insurance coverage Plaintiffs requested; and

k)     Agent would procure such coverage.

153.    Indeed, Agent procured and State Farm issued the Policy. Plaintiffs received premium statements and paid such statements in a timely manner. At all times material hereto, the Policy remained in full force and effect, and Plaintiffs complied with all terms and conditions of the Policy.

154.    Plaintiffs purchased and renewed the Policy in reliance on representations by Agent. Plaintiffs reasonably relied on Agent's representations in reasonably assuming the Policy provided the coverage Plaintiffs requested and Agent represented it would provide.

155.    In reality, the coverage supposedly provided by the Policy and procured by Agent was illusory. Contrary to Agent's representations, the Policy failed to:

a)     pay full replacement cost coverage on the Dwelling;

b)     provide coverage for damage caused by earthquakes;

c)     factor in accurate information about the Dwelling when calculating the replacement cost valuation and additional premium cost for the earthquake endorsement;

d)     indemnify Plaintiffs to pre-loss condition;

e)     comply with Plaintiffs' requests; and

f)     comply with Agent's representations.

156.    Plaintiffs had no means to discover the Policy would not afford replacement cost benefits until after State Farm denied the Claim.

157.    Agent breached the duty owed to Plaintiffs. Specifically, Agent failed to (at least):

a)     perform all necessary inspections of Dwelling;

b)     confirm whether the Dwelling met the necessary underwriting requirements of State Farm, particularly with regard to preexisting damage;

c)     procure coverage as Plaintiffs requested;

d)     procure coverage as represented;

e)     renew coverage as requested;

f)     renew coverage as represented;

g)     follow and abide by State Farm's underwriting policies, procedures, and guidelines;

h)     accurately calculate the replacement cost values;

i)     advise Plaintiffs that Agent utilized a valuation software to calculate the Dwelling's replacement cost value while knowing such software was inaccurate and in no way commensurate with the estimating software used in claims; and

j)     advise Plaintiffs that Agent utilized a valuation software to calculate the Dwelling's replacement cost while knowing such software was inaccurate and systematically and methodically designed to overinflate premiums to maximize the State Farm's financial gains.

158.    Agent knew, or should have known, Plaintiffs would rely (and indeed relied) on Agent's representations. It was therefore foreseeable that Agent's breach would unnecessarily expose Plaintiffs to significant harm, losses, and damages.

159.    Such harm, in fact, occurred. As a result of Agent's conduct, Plaintiffs sustained damages, including deprivation of monies State Farm rightfully owed to Plaintiffs, anger, stress, worry, as well as physical and emotional suffering. Further, Agent's conduct caused damages to Plaintiffs in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

160.    The conduct of Agent and State Farm was intentional, willful, and malicious; in reckless disregard of the rights of the Plaintiffs; and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

### COUNT FIVE
### Constructive Fraud and Negligent Misrepresentation
*Against Defendant Agent*

161.    All preceding paragraphs are incorporated as if fully set forth herein.

162.    Plaintiffs engaged Agent to obtain a full replacement cost policy with an earthquake endorsement for the Dwelling.

163.    Agent represented to Plaintiffs that State Farm's replacement cost earthquake coverage would cover any and all damage caused by an earthquake.

164.    More importantly, Agent further represented to Plaintiffs that all required inspections occurred, and the Dwelling met all State Farm's underwriting guidelines.

165.    Agent further represented and that the condition of the Dwelling was good and that there were no pre-existing issues with the Dwelling that would either prevent issuance of the replacement cost earthquake policy or exclude earthquake coverage for any damages sustained to the Dwelling.

166.    Agent had a duty to exercise reasonable diligence and skill in obtaining and accurately notifying Plaintiffs of the nature and character of the insurance procured. Agent

breached this duty by misrepresenting and/or concealing pertinent material facts to Plaintiffs as follows:

a)  selling illusory insurance coverage to Plaintiffs;

b)  misrepresenting to Plaintiffs at the time the Policy was issued and with each renewal that:

   i)  a replacement cost earthquake endorsement with State Farm was worth the additional premium cost because it would indemnify Plaintiffs fully in the event of earthquake damage to the Dwelling, while knowing such statement was untrue;

   ii)  a replacement cost earthquake endorsement with State Farm covered any and all damage resulting from an earthquake, while knowing such statement was untrue;

   iii)  the Dwelling qualified for the coverage and met all underwriting requirements without having conducted any form of inspection to verify whether that was true;

   iv)  the Dwelling did not have any preexisting conditions that would work exclude coverage without having conducted any form of inspection to verify whether that was true;

   v)  there was a real benefit in purchasing and maintaining replacement cost earthquake coverage, knowing such statement was untrue;

   vi)  the replacement cost valuation (and as independently calculated by Agent) was, in reality, an amount commensurate with supported valuation calculations that were necessary to replace the Dwelling in the event of a loss;

   vii)  the replacement cost valuation (and as independently calculated by Agent), and for which premiums were paid, was equal to the estimated replacement cost (*i.e.*, 100 percent insurance-to-value);

   viii)  Agent and State Farm followed and met all State Farm's underwriting guidelines, policies, and procedures when they did not;

   ix)  Agent and State Farm properly conducted all necessary inspections of the Dwelling when they did not;

   x)  the valuation software utilized was accurate and commensurate with the estimating software that would be used in claims when it is not; and

xi)    the value of the stated coverages under the Policy (as set forth in the renewal) were accurate given the damages sustained on the claim that was denied due to alleged "pre-existing" conditions.

167.    As a result of Agent's breach of duty, Agent gained an advantage for himself by misleading Plaintiffs to Plaintiffs' prejudice.

168.    Agent's misrepresentations constitute constructive fraud.

169.    Agent's misrepresentations and constructive fraud misled Plaintiffs, who relied on Agent's misrepresentations to Plaintiffs' detriment.

170.    Agent's misrepresentations and constructive fraud induced Plaintiffs to accept, purchase, and renew the Policy.

171.    Agent is State Farm's agent and/or ostensible agent for purposes of these misrepresentations, and as such is vicariously liable for them.

172.    As a result of Agent and State Farm's constructive fraud and misrepresentation, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, anger, stress, worry, physical and emotional suffering, and have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

173.    Agent and State Farm's conduct was intentional, willful, malicious; in reckless disregard of Plaintiffs' rights; and/or was grossly negligent; and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

## IX.    PRAYER FOR RELIEF

WHEREFORE, premises considered, the Court should enter judgement in Plaintiffs' favor and against all Defendants as follows:

a)    Actual and punitive damages each in an amount in excess of $75,000.00;

b)      Disgorgement of the increased financial benefits derived by any and/or all other

Defendants as a direct result of the Defendants' wrongful conduct;

c)      Prejudgment interest, costs, and attorneys' fees; and

d)      Any other relief the Court deems appropriate.

## X.    JURY DEMAND

174.    Pursuant to Okla. Const. Art, 2, §19, trial by jury of all claims so triable in this

lawsuit is hereby demanded.

Respectfully submitted,

Jeff D. Marr, OBA No. 16080
Carole Dulisse, OBA No. 18047
**MARR LAW FIRM**
4301 Southwest Third Street
Oklahoma City, OK 73108
Telephone:      (405) 236-8000
Facsimile:      (405) 236-8025
Email:     jeffdmarr@marrlawfirm.com
                cdulisse@marrlawfirm.com

– *and* –

Reggie Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
J. Revell Parrish, OBA No. 30205
**WHITTEN BURRAGE**
512 N. Broadway Ave., Suite 300
Oklahoma City, OK 73102
Telephone:      (405) 516-7800
Facsimile:      (405) 516-7859
Email:     rwhitten@whittenburragelaw.com
                mburrage@whittenburragelaw.com
                rparrish@whittenburragelaw.com

– *and* –

Chad E. Ihrig, OBA No. 19491
**NIX PATTERSON, LLP**
8701 Bee Cave Road,
Building 1, Suite 500
Austin, Texas 78746
Telephone:     512.328.5333
Facsimile:     512.328.5335
Email:    cihrig@nixlaw.com

Nick Marr OBA No. 34284
Ashton Poarch OBA No. 34308
**NIX PATTERSON, LLP**
512 N. Broadway Ave.
Suite 200
Oklahoma City, OK 73102
Telephone:     405.516.7800
Facsimile:     512.328.5335
Email:    nmarr@nixlaw.com
             apoarch@nixlaw.com

*Counsel for Plaintiffs*

<u>**ATTORNEYS' LIEN CLAIMED**</u>
<u>**JURY TRIAL DEMANDED**</u>